UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SEAN PEARSON,

                        **COMPLAINT**

                        **13cv6868 (LTS)**
                        **ECF Case**

        Plaintiff,

    vs.

The CITY OF NEW YORK, DETECTIVES
SID CAESAR, Shield # 2062
VICTOR CARDONA, Shield # 446
JOHN TALAVERA, Shield # 7085,
in their individual and official capacities,

                        **JURY TRIAL DEMANDED**

               Defendants.
----------------------------------------------------------x

Plaintiff Sean Pearson, by his attorney, Cyrus Joubin, complaining of the Defendants,

respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.    This civil rights action arises from the arrest and prosecution of Sean Pearson

("Plaintiff") on the false and fabricated grounds that he possessed marijuana.  Plaintiff

asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against the

individual defendants for unreasonable search and seizure, false arrest and imprisonment,

malicious prosecution, and failure to intervene, and a *Monell* claim against the City of

New York for the same constitutional violations.  Plaintiff seeks compensatory and

punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state

and federal civil rights law.

## JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and

the Fourth Amendment to the United States Constitution.  Jurisdiction is conferred upon

this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

### VENUE

3.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district and Plaintiff resides in this district.

### JURY DEMAND

4.    Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

### PARTIES

5.    Plaintiff Sean Pearson is an African-American male, a citizen of the United States, and at all relevant times a resident of the City of New York, State of New York.

6.    The individually named defendants Detective Sid Caesar (Shield # 2062), Detective Victor Cardona (Shield # 446), and Detective John Talavera (Shield # 7085) (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

7.    Upon information and belief, on the date of the incident giving rise to this complaint, the individual defendants were assigned to the Narcotic Borough Manhattan North in Manhattan.

8.    Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

9.     Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

10.     Plaintiff lives at 107 East 126th Street, Apartment 3C, New York, NY 10035 (the "Apartment").

11.     On April 12, 2013, at around 4:20 PM, Plaintiff arrived at his Apartment building, having just finished work at his construction job, still wearing his work clothes, and carrying a bag full of construction tools.  His plan was to take a shower then pick up his son from day care.

12.     Plaintiff's Apartment building has multiple security cameras in the lobby, as well as 24-hour security guards who monitor the entryway and "buzz in" residents by remotely unlocking the door.

13.     Plaintiff was in the vestibule of his Apartment building with a group of other residents, until one of the security guards remotely unlocked the door, allowing the group of residents to enter the Apartment building lobby.

14.     Following Plaintiff and the group of residents into the building was Detective Sid Caesar ("Det. Caesar"), who was dressed in plain clothes.

15.     Upon entering his Apartment building, Plaintiff immediately took a right and walked down the hallway to the elevator bank, where he waited for the elevator with a few other residents from his building.

16.     At no point in his Apartment building did Plaintiff do anything unlawful or suspicious.

17.     As he waited for the elevator, Plaintiff heard Det. Caesar yell "Get on the ground now!" and at the same time felt Det. Caesar push him to the ground.

18.     Det. Caesar barked his order at Plaintiff and two other black men – also residents of the Apartment building – who were waiting by the elevator bank.

19.     Plaintiff, who had done nothing illegal or suspicious, fell to the ground as a result of Det. Caesar's push and he stayed on the ground, in compliance with Det. Caesar's order, remaining on his stomach.

20.     The female residents who were waiting for the elevator were not told to get on the ground; seeing Plaintiff on the ground, they told Det. Caesar that Plaintiff was a resident of the Apartment building.

21.     Det. Caesar nevertheless demanded Plaintiff's identification, and Plaintiff provided his NY State driver's license, which identified Plaintiff's address as:  107 East 126th St., Apt. 3C, New York, NY 10035.

22.     Plaintiff was ordered to remain on the ground for several minutes after Det. Caesar had verified his identity and address on his driver's license.

23.     Plaintiff was on the ground for about ten minutes; he was eventually permitted to go from his stomach to his knees.

24.     Det. Caesar was joined in the lobby of the Apartment building by Detective Victor Cardona ("Det. Cardona") and Detective John Talavera ("Det. Talavera").

25.     These three detectives had planned a sweep of the Apartment building's lobby – a plan by which all men would be stopped and questioned for trespassing.

26.     Although the three defendant detectives knew that Plaintiff was a resident of the Apartment and had done nothing unlawful, they agreed to arrest him and charge him with criminal possession of marijuana on the mendacious and bogus grounds that

Plaintiff was handed two bags of marijuana in the lobby and then threw them on the ground.

27.     The defendant detectives allegedly found two ziplock bags containing marijuana near another of the black male residents they had ordered to the ground, but they knew that bag did not belong to Plaintiff and was never in his possession.

28.     Nevertheless, Det. Caesar handcuffed Plaintiff along with the two other male residents who were ordered to the ground.

29.     A few minutes later, one of those men was uncuffed and released in the Apartment building.  When Plaintiff asked why that man, but not Plaintiff, was released, he was told:  "Mind your fucking business."

30.     Plaintiff and the other arrested resident were transported in handcuffs from the Apartment building to a police van, where Plaintiff remained for about three hours.

31.     Detectives Cardona and Talavera took Plaintiff to the 25th Precinct where they processed Plaintiff, deliberately drawing up mendacious paperwork against him, falsely charging him with criminal possession of marijuana.  They communicated this mendacious information to the New York County's District Attorney's Office.

32.     At about 10:30 PM, Plaintiff was given a Desk Appearance Ticket ordering him to appear at New York County Criminal Court on June 3, 2013, and he was released soon thereafter.

33.     On June 3, 2013, Plaintiff was arraigned in NY County Criminal Court and charged with Penal Law § 221.10(1) (Criminal Possession of Marijuana in the Fifth Degree) and Penal law § 221.05 (Unlawful Possession of Marijuana).

34.     The prosecution – The People of the State of New York v. Sean Pearson – was given docket number 2013NY044247.

35.    The fabricated factual allegations of the misdemeanor complaint were supplied by defendant detectives Caesar, Cardona, and Talavera, with Det. Cardona being the deponent who signed the complaint; his signature bears the date April 13, 2013.

36.    According to the complaint, Det. Caesar "states that he observed Frequan pass two ziplocks of marijuana, which was open to public view, to defendant." This allegation is false, as the defendant detectives well knew.

37.    Moreover, the complaint alleges that the incident took place "inside 129 East 126th Street in the County and State of New York." This allegation is also false; the defendant detectives knew the true location of Plaintiff's arrest was his Apartment building at 107 East 126th Street.

38.    At his arraignment, Plaintiff's case was adjourned to July 17, 2013, in Part C of New York County Criminal Court.

39.    Plaintiff attended court on July 17, 2013, at which point the case was adjourned again to September 9, 2013.

40.    Plaintiff also attended court on September 9, 2013, at which point the case was dismissed pursuant to Criminal Procedure law § 30.30 (Speedy trial).

41.    The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior.

42.    In response to the serious complaints made against the individual defendants, the NYPD failed to properly investigate, adjudicate, and impose discipline, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to violate the rights of civilians, and emboldening them to abuse their powers.

43.     The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes an irrational custom and policy that fosters a culture of mendacity in the NYPD.

44.     There is a systemic failure to identify, discipline, and supervise NYPD officers with propensities to fabricate charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

45.     Defendant City enforces, promotes, authorizes, and sanctions the NYPD's customs and practices of failing to adequately investigate and address allegations of officer mendacity in the creation of criminal charges.  Such mendacity encompasses the wrongs of perjury, making official false statements, and preparing false reports.

46.     To the wrongdoing of officer fabrication in the context of filing criminal complaints – Defendant City has turned a blind eye, a blindness that constitutes deliberate indifference.  The excellence with which the NYPD monitors and regulates, say, officers' use of a firearm, highlights its woeful inadequacy in monitoring and regulating officer integrity and mendacity in the filing of criminal charges.

47.     One feature of Defendant City's policy and custom is the absence of a serious policy and custom:  there is no serious mechanism in place by which to effectively identify and weed out dishonest officers, even when their mendacious behavior abrogates the constitutional rights of citizens.

48.     In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.

49.     The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

50.     Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements.  On the basis of the Commission's recommendations, the NYPD's has adopted a False Statement Policy that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

51.     In its Annual Reports, the Commission has found that the NYPD "failed to charge the subject officer with making a false statement although such a charge appeared appropriate" (2006 Annual Report).  The Commission has "believed that often other similar charges were levied instead to avoid the imposition of the False Statement Policy's requirement of termination" (2008 Annual Report).  In addition, "[a]s the False Statement Policy was increasingly upheld, the Commission found an increase in the finding of exceptional circumstances to justify a penalty that did not result in termination" (2008 Annual Report).

52.     In the 2009 Annual Report, three cases were studied where police officers signed criminal court documents under penalty of perjury which contained falsehoods – but rather than face the penalty of termination, the officers each lost thirty vacation days. The Commission stated in the Report that the NYPD "failed to follow its false statement policy."

53.     In the 2010 Annual Report, the Commission identified only ten IAB cases that included allegations of making an official false statement.

54.     In the 2011 Annual Report, the number of IAB cases where it appeared the subject officer made an official false statement was nineteen.  Of these, seven cases involved false statements in court documents (supporting depositions, criminal court complaints, and affidavits).  None of those seven cases resulted in the subject officer's separation from the NYPD.

55.     In the 2012 Annual Report, there were only eleven IAB cases involving an official false statement subject to the NYPD's False Statement Policy.  Four of these cases involved court documents, and in none of those four cases was the subject officer separated from the NYPD.  This Annual Report continued to find instances where officers were too lightly punished for making false statements.  The Commission also found seven cases involving false statements in court documents where the subject officers should have been charged with making a false official statement but were not.

56.     The 2012 Annual Report states:  "It is important to have consistency in the application of the False Statement policy, from the charges brought to the penalties imposed.  Consistency enables members of the Department to know what they can expect when they make false official statements and helps ensure the deterrent effect that was originally intended" (page 45).

57.     Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.  But for making false statements on court documents, NYPD officers often face only minor discipline or no discipline whatsoever.

58.     The number of false statement cases investigated by the IAB in the context of court documents is a very small portion of the actual number of instances of material

fabrication in court documents, particularly criminal court complaints, for most of these instances go unreported.

59.     The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

60.     The inadequacy of NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals," which pressure officers to arrest people and file charges unlawfully, a pressure not tempered by adequate safeguards that ensure citizens are not being wrongfully arrested and charged.

61.     On October 17, 2011, NYPD Commissioner Raymond Kelly directed the release of Operations Order No. 52, which mandates that "Department managers can and must set performance goals" related to issuing summons, questioning suspicious individuals, and arresting criminals.

62.     Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges; such perverse incentives become particularly destructive in the hands of undisciplined, unsupervised officers.

63.     Beyond recognizing the formal complaints that are made against NYPD officers, Defendant City does not actively monitor or report the filing of false or fabricated charges.

64.     For example, Defendant City has failed to adequately inquire into the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme

Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

65.    In a criminal justice system where numbers and statistics have become paramount, the temptation by officers and precincts to cheat and manipulate numbers has been under-recognized by Defendant City.  The discrepancy between the official policy of integrity and the actual practices of mendacity is a discrepancy Defendant City has failed to address in more than conclusory fashion.

66.    Despite well-publicized and recent events that underscore the problems of officer dishonesty (Adrian Schoolcraft, ticket-fixing, and a secret quota system, to name a few), the issue of officer dishonesty in the important context of filing criminal charges has been largely overlooked.

67.    Through the data cited herein along with other information in its possession, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the filing of fabricated criminal charges; by doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its citizens.

68.    As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

       a.    Violation of his constitutional rights under the Fourth Amendment to the United States Constitution;

       b.    Severe emotional trauma, distress, degradation, and suffering;

       c.    Loss of income and income potential.

## SECTION 1983 CLAIMS

## FIRST CLAIM

### Deprivation of Federal Civil Rights Under Section 1983

69.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

70.     All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

71.     All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth Amendment to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

72.     The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth Amendment of the United States Constitution.

73.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## SECOND CLAIM

### False Arrest Under Section 1983

74.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

75.     By the actions described above, Defendants deprived Plaintiff of his federal civil rights, including his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free of false arrest.

76.     As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

77.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## THIRD CLAIM

### Malicious Prosecution Under Section 1983

78.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

79.     By the actions described, the Defendants deprived Plaintiff of his Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically his right to be free from malicious prosecution.

80.     Without probable cause, the individual defendants directly and actively initiated a criminal proceeding against Plaintiff, collectively creating a fraudulent theory of guilt, providing a mendacious felony complaint to the D.A., alleging an overtly false identification of Plaintiff.

81.     In commencing a felony prosecution against Plaintiff, the individual defendants acted with actual malice, with reckless disregard for Plaintiff's innocence, deliberately fabricating charges against Plaintiff, intentionally misleading the D.A., doing so not to bring an offender to justice but to degrade Plaintiff, and to falsely justify and perpetuate their unlawful conduct.

82.     As a result of the malicious prosecution, Plaintiff was ordered, under threat of warrant and arrest, to return to court, and Plaintiff had an order of protection issued against him.

83.     The criminal proceeding terminated in Plaintiff's favor when all charges against him were dismissed.

84.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged .

## FOURTH CLAIM

### Failure to Intervene Under Section 1983

85.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

86.     Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other law enforcement officers.

87.     The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of his constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

88.     As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged .

## FIFTH CLAIM

### Illegal Stop

89.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

90.     Individual defendants violated the Fourth Amendment because they forcefully stopped and detained Plaintiff without reasonable suspicion.

91.     As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged .

## SIXTH CLAIM

### Municipal Liability Under Section 1983

92.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

93.     By the actions described, the Defendant City deprived Plaintiff of his Fourth Amendment right to be free of false arrest and malicious prosecution through its official policy and custom of having weak disciplinary measures for NYPD officers who have histories and propensities of fabricating criminal charges; a policy and custom of systematically ignoring credible doubts about police officers' integrity, thereby fostering a culture of dishonesty among those who wield considerable power over the lives of everyday citizens; a policy and custom of failing to adequately investigate and punish dishonesty in the creation and initiation of criminal charges, which encourages unscrupulous officers to deprive citizens of rights and to lie about it.

94.     By continuing to allow potentially malicious, dishonest, rogue officers the power to, among other things, carry a gun, make arrests, and initiate criminal charges against New Yorkers, the Defendant City has exhibited deliberate indifference to the safety, well-being, and rights of New Yorkers.

95.     By tolerating weak and ineffectual means of supervising, regulating, sanctioning, disciplining, and monitoring malicious and mendacious officers, Defendant City has intentionally disregarded the constitutional rights of New Yorkers.

96.     As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged .

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.      An order awarding compensatory damages for Plaintiff Sean

        Pearson in an amount to be determined at trial;

b.      An order awarding punitive damages in an amount to be

        determined at trial;

c.      A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is

        entitled to reasonable attorney's fees, costs and disbursements; and

d.      Such other and further relief as this Court may deem appropriate.


DATED:      September 26, 2013              _____s/_____
            New York, New York             CYRUS JOUBIN, ESQ.
                                           317 Lenox Avenue, 10th Fl.
                                           New York, NY 10027
                                           (703) 851-2467
                                           joubinlaw@gmail.com
                                           Attorney for Sean Pearson